(C. D. 1218)

BAKER, LYMAN & CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided March 6, 1950)

*Philip Stein* (*Marjorie M. Shostak* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Dorothy C. Bennett* and *Richard F. Weeks,* special attorneys), for the defendant.

Before LAWRENCE and FORD, Judges; RAO, J., not participating

FORD, Judge: The three protests listed above present for decision the question of the proper classification of certain imported merchandise described on the invoice as "Davis's Az. Tables" or some modification of those words. This merchandise was classified as charts and duty was levied thereon at the rate of 20 per centum ad valorem under paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753. Plaintiff claims said merchandise to be properly dutiable at only 7½ per centum ad valorem under said paragraph 1410, as modified by the above-cited trade agreement, as bound books of *bona fide* foreign authorship.

Also included on the invoices before us are a number of copies of "Burdwood's Az. Tables" and "Davis's Star Tables," which items were classified as books of *bona fide* foreign authorship, and duty was

levied on these items at the rate of 7½ per centum ad valorem under paragraph 1410 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T. D. 49753. As to these latter items no contention is made by the plaintiff, but its claim is specifically limited to the merchandise which was assessed with duty at 20 per centum, as set out above.

On motion of counsel for the plaintiff at the trial the following exhibits were admitted in evidence:

Copy of Davis's Star Azimuth Tables_____ Exhibit 1
Copy of Davis's Tables, Revised Edition (Davis. 1)__ Exhibit 2
Copy of Burdwood's Tables, 2nd Edition (Davis. 2)__ Exhibit 3
Copy of H. O. No. 71, Azimuths of the Sun and
   other Celestial Bodies_____ Illustrative Exhibit A

Plaintiff called as its first witness the president of the importing corporation, who stated that his company was incorporated in March 1932, and that prior to that he was connected with the New Orleans branch of John E. Hand & Sons Co.; that his company handles nautical instruments such as compasses, sextants, azimuth mirrors, charts and books, and all instruments of navigation, and that as manager of John E. Hand & Sons Co. and Baker, Lyman & Co., Inc., he had been handling this line of merchandise since 1920.

The witness also testified that exhibit 2 is sold principally to ship owners and is used by navigating officers of vessels in connection with, and for the correction of, the compass; that he had worked as a compass adjuster for 20 years; that compass adjusting consists of correcting the compass for the attraction that the ship itself has for it, for magnetic material of the ship affects a compass and distorts it from its true direction; and that this is done with an azimuth instrument of some sort on the ship's compass. "We compare that with the true bearing as given in the Davis or Burdwood tables. If there is not an agreement, the compass is in error." The error is then corrected by the use of permanent magnets or various magnetic elements. Burdwood's tables and Davis's tables have the same matter for different latitudes, Davis's taking from the equator to 30 degrees, and Burdwood's from 30 degrees to 64 degrees. As to exhibit 1, Davis's Star Azimuth Tables, the witness stated that it is different from the other exhibits in the respect that it is for higher declinations, and explained that declination is celestial latitude, and that that is found from the tables, meaning the tables in the exhibits before the court. The witness also stated that "Except for differences of latitude and declinations, they [meaning all the exhibits herein] are identical. They serve the same purpose; they are in the same form."

The witness further testified with reference to the composition of exhibit 2 that with his experience he could not write this exhibit because he did not know trigonometry and that it would require some

one with a knowledge of trigonometry and a great knowledge of mathematics to compose and author a book of this kind; that in his opinion this book was copyrighted in England because of the notation on the flyleaf "All rights reserved," and that "means the same to me as copyright in an American book because we handle a great number of English books and I have never seen anything but this 'All rights reserved.' "

Referring to the identifying characteristics of a chart which differentiate it from a book, the witness stated:

A chart is a map which shows primarily the water and the depths of the water and it shows the aids to navigation. It is only a sheet of paper.

As to the physical characteristics of a chart and exhibits 1, 2, and 3, and illustrative exhibit A, the witness stated: "There is no resemblance whatever"; that a chart shows the features in the various latitudes covered by the chart, whereas these books give the sun's bearing at different latitudes; "no resemblance to the matter given in charts." And finally the witness stated that he was familiar with the work, Lecky's Wrinkles Practical Navigation, published in 1881, in which he makes reference to these tables by Burdwood and Davis, and that he considered that work an authority on the subject.

The second witness, whose testimony was offered by counsel for the plaintiff, stated that he had been in the marine business practically all his life; that he was the author of a number of books and tables of navigation.

I have approximately 100 articles on navigation published in various boating magazines, here and in England, and I have a book of navigation wrinkles for motorboats, which was the text book used in most of the navy establishments for teaching navigation to small boat crews; vice-president of Higgins Industries. I was in charge of the school for boat operators which taught navigation to some 30,000 men of the armed forces—the Navy, Coast Guard, and on Army boats; was the only commercial school that was in existence before we entered the war, and still in existence after we entered the war.

\* \* \* \* \* \* \*

I was one of the charter members and on the first board of directors of the Institute of Navigation, an organization formed about 2 years ago to coordinate navigation with the air lines; the Army, Navy, Coast Guard and surface vessels.

With reference to the tables which he had authored, the witness stated:

\* \* \* That was a table compiled at the request of the United States Navy whereby a second-class fireman in a lifeboat or a raft could obtain his position without previous instructions within 15 minutes and new tables that had never been devised before had to be constructed for use on our P. T. boats.

The witness stated that he became familiar with exhibit 2, Davis's Tables, when he went to Captain Howard Paterson's New York Nautical College, back about 1910 or 1911, by using it in solving prob-

lems of compass correction, because in those days we did not have the navigation tables of Ageton or Driesinstock. Further explaining the reasons for the production and development of the publications represented by the exhibits herein, the witness stated:

Those are all tables that were developed later as marine transportation and speeds increased. If I can bring out this point to you, the Burdwood tables was devised because in 1866, we were changing from wood to steel; from sail to steam; ships were making faster and faster speed and with steel ships, the compass would frequently be thrown out and it was necessary for the master of the ship at frequent intervals—every day or two—to take what was classed an azimuth; taking a bearing of the sun and correct it. Often times, perhaps, the shifting in cargo might change the deviation. There are two corrections—there is variation which is caused by the needle pointing to the magnetic north pole and then there is deviation, which is caused by magnetic attraction to the ship itself; and, in 1866 when they got in the steel ships, it amounted to quite a bit. So, there had to be some simple method that ship·masters who came up through the hawse and forecastle—in other words, he came up before the mast—he was not a college professor, and it would have been rather difficult for such a ship master who perhaps never got beyond the fifth or sixth grade to take a formula in spherical trigonometry and figure out just what the bearing of the sun should be at a certain latitude at a certain hour on a certain day. So, Burdwood recognizing that necessity existed, he first devised a formula—mathematical formula and explanation as to how it could be used, and then compiled the tables together with those directions. The tables were always a supplement to the method that was devised by the author, and of course, later it became so familiar that it could be reduced to a mere few words as it exists in the published books that are shown here. Another reason that the book was published at that time was that in those early days, the position of the ship was determined at sea by observation of the sun at noon for latitude and then in the morning or the afternoon when the sun was in the east or the west, for longitude. They, until approximately 100 years ago, about 1847, when Summer—Captain Summer, American ship captain from Boston who was sailing from Savannah to England, he was approaching the Irish coast and he figured he couldn't get a sight or latitude. He wasn't sure of his latitude for several days; so, in figuring his position for longitude in the afternoon in the formula that was known then, known as the time sight, you had to have your latitude. If your latitude was wrong, your longitude was going to be off. So, he figured what his approximate latitude was, put his position down, then he sailed and said, well, I might be 20 miles north of here and I'll use a latitude 20 miles north of this point. He did that; figured a second position; then, he being a very thorough man, he said, I might be 20 miles south and I'll figure it again with an assumed latitude 20 miles south of where I think I am. He did that. When he put them on the chart, they were in line. For the first time, man had developed or invented by accident what is known today in navigation as a line of position and the line of position is always at right angles to the bearing of the sun. That is the reason why those three positions had to be in line. He looked further on the chart and found those three positions were lined up with a lighthouse on the coast of Ireland, so, he changed his course and sailed along that line of position and picked up the lighthouse. When that happened, he realized he had developed something new in navigation, but it was about 10, 15 or 20 years before he ever got around to publishing that fact and it was necessary to have an azimuth of the sun in the navigation tables used today. The altitude of the sun and the azimuth are found together, but, in those days, they were not. So, the ship master could

take a bearing of the sun, correct it for deviation or for variation, but a better way was to use the time sight, and Burdwood's tables, which they did do up until—well, up into this century when the later mathematical tables came into existence. Well, Burdwood's was fine so far as it went, and along came Davis and took Burdwood's tables and supplied the missing parts in latitude. Now, you asked a question—the question was asked about declination. Declination is merely a latitude of the sun or a heavenly body. That is, if a plumb line was dropped from the sun to the earth on June the 21st, it would hit the earth at about 22 degrees latitude. On March the 21st, the first day of spring, it would be right on the equator. So for the sun, tables like Burdwood's was only needed up to about 22 or 23 degrees. When you got stars, you might get stars with declination as much as the North Star, which is 90 degrees, so they needed tables with more declinations and Davis brought those tables out too. Then along came the United States Government with H. O. 71, because they wanted an American publication that perhaps you wouldn't have to pay duty on or attribute to a British officer. They brought out H. O. 71 and they condensed it and made it for every ten minutes. It was an American naval officer—devised by an Italian naval officer, and then along came Cugle who died—he was one of the bar pilots here on the Mississippi River—and he constructed a set of tables for every two minutes of time. So, each one of these tables was devised by a scientist—a navigator who felt that he was filling a demand by other ship masters.

As to the citizenship of J. E. Davis and Percy L. H. Davis, whose names appear on the flyleaf of exhibit 2, the witness stated that they were officers of the Royal Navy and he assumed they were British citizens because of their being British Navy officers; that according to his understanding, the author of exhibit 2 was a British subject.

When the witness was interrogated as to the meaning of the words "All rights reserved," appearing on the flyleaf of exhibit 2, he answered:

It means that if I were to copy any part of that book, the publishers or author would prosecute me for having taken the brainchild of another man; another man's property.

He also stated that the man who prepared exhibit 2 had to be a mathematician and astronomer, and that he certainly considered it a scientific work.

Judge Lawrence: What distinction do you make between a chart and a publication like Davis's or Burdwood's Tables?

The Witness: There is much difference between a chart and any of Burdwood's Tables or any other tables as there is between night and day. The difference is this, your Honor. If you want to drive from here to Chicago, you will get a road map and that road map is a picture of the route that you are taking and the towns that you will pass through. You could also obtain the Automobile Blue Book which would describe the route from here to Chicago where to turn left and right. The chart would be made by engineers, surveyors. They would take all existing data and information and matter that they have and compile it into a convenient chart for you, showing the road from New Orleans to Chicago, but in the Blue Book, an automobile driver, an experienced driver would have to make over that route and make notations to tell you what route to take and that was the method that was used before our highways were marked.

There is also testimony to the effect that there is as much difference between exhibit 2, and the other exhibits herein, and a chart, as there is between a city directory and a map of the same city, and finally, that in the preparation of exhibit 2 by Percy L. H. Davis, he had to do a lot of original work and research.

On the flyleaf of exhibit 2, the following appears:

SUN'S TRUE BEARING or AZIMUTH TABLES by The Late J. E. DAVIS, R. N. Of the Hydrographic Department, Admiralty. A REVISED EDITION OF THE ABOVE With Extensions in Declination and Hour-Angle has been prepared by PERCY L. H. DAVIS, F. R. A. S., Chief Assistant (retired) in H. M. Nautical Almanac Office.

On the next page thereafter appears the following:

DAVIS'S TABLES—REVISED EDITION. AUTHOR'S NOTE. The present book is complementary to the revised edition of Burdwood's Tables already published, and the writer hopes that it will find equal favour with seamen of all nations, for whose use it is intended.

PERCY L. H. DAVIS.

Then follows 249 pages of rather finely printed figures, arranged in columns of 15 to the page, which, to the ordinary layman might mean little or nothing, but to the capable navigator these figures are readily understandable, and according to this record, in order for navigators to pursue their business on the high seas, they would have to have a copy of exhibit 2, or a copy of some other similar book.

In *United States* v. *American Railway Express Co. et al.*, 17 C. C. P. A. (Customs) 10, T. D. 43317, in holding the merchandise there involved to be susceptible of authorship, our appellate court said:

* * * It is sufficient to say that the exhibits are full of descriptive historical and geographical matter, and such matter as required mental effort and ability to prepare. It is said that some of these exhibits, notably illustrative Exhibit No. 6, Hotels and Boarding Houses, is nothing but a compilation, and is not the work of an author. The testimony shows, as to this particular exhibit, that the person preparing it was obliged to investigate throughout the Canadian Provinces, and to obtain, in any way he could, information as to the various hotels and boarding houses and camps, and was required to arrange the same so that the information might be accessible. In addition, many tabulated statements of other matters of information to the traveler are contained in this pamphlet, which includes 80 pages of closely printed informative material. We are aware of no definition of authorship which would exclude a work such as this. To do so would exclude many valuable scientific publications, *works on mathematics*, digests, travelers' guides, and similar works, which, although to a considerable degree compilations, are, nevertheless, works which require authorship. [Italics ours.]

In the words of the above decision, "We are aware of no definition of authorship which would exclude a work such as" exhibit 2 herein. "To do so would exclude many valuable scientific publications, *works on mathematics*, digests, travelers' guides, and similar works, which, although to a considerable degree compilations, are, nevertheless, works which require authorship." [Italics ours.]

An examination and a consideration of the record before us, including the exhibits, in connection with the lexicographic definitions of the words "bound books," satisfy us that exhibit 2 is a bound book, susceptible of authorship, and that it was written, authored, and produced by a person other than an American citizen.

Counsel for the plaintiff also contends that section 315 of the Tariff Act of 1930, as amended by section 6 of the Customs Administrative Act of 1938, supports his contention that the involved merchandise is dutiable at only 7½ per centum ad valorem under said paragraph 1410, as modified by the trade agreement, *supra*, as bound books of *bona fide* foreign authorship. Said section 6, so far as here pertinent, reads as follows:

* * * No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; * * *.

In T. D. 50971 (2), 79 Treas. Dec. 109, the following appears:

(2) *Tables in book form.*—Tables ("Burdwood's Tables, 2nd Edition (Davis, 2)" and "Davis's Star Azimuth Tables, 60° N to 60° S") bound in book form, each with a title page, preface, a subordinate title page, and footnotes on pages containing tables, all of which are incidental to the tables, are dutiable at 20 per centum ad valorem as charts under paragraph 1410, Tariff Act of 1930, as modified pursuant to the British Trade Agreement (see T. D. 48979), rather than as books of foreign authorship under the same paragraph. As this ruling will result in the assessment of duty at a rate higher than has heretofore been assessed on such or similar merchandise under a uniform practice, it shall be applied only to such and similar merchandise entered for consumption or withdrawn from warehouse for consumption after 30 days after the publication of this abstract in the weekly TREASURY DECISIONS. * * *

The record before us shows that the entries here involved were filed at the port of New Orleans on June 9, August 6, and August 17, 1943, and it is also shown by the Treasury Decisions pamphlet in which T. D. 50971 (2) appears that the above ruling was not published until December 2, 1943, some 4 or 5 months after the entries herein were made. By reason of the provisions of section 315, as amended, *supra*, and also by the terms of the said T. D. 50971 (2), the higher rate of duty authorized in the said administrative ruling could not become effective until 30 days after the publication of such ruling in the weekly Treasury Decisions. While it is true that the liquidation of all the entries here involved took place after the effective date of the administrative ruling in question, the higher rate specified in said ruling was not applicable, since all of the merchandise had been entered for consumption prior to the publication

of such ruling in the Treasury Decisions. It is also made clear from an examination of the official records before us, and from an examination of other public documents, as to which the court may take judicial notice, that the liquidations of the merchandise here involved at the higher rate were inconsistent with the uniform classification admitted by the above-quoted treasury ruling to have been in effect on the dates of entry of the involved merchandise.

The language of section 6 of the Customs Administrative Act of 1938, amending section 315 of the Tariff Act of 1930, is clear and unambiguous and requires no construction or interpretation, and in our view strongly supports the contention made by the plaintiff.

For the reasons heretofore stated and following the authorities cited and quoted, we hold the merchandise represented by exhibit 2 herein, Davis's Tables, Revised Edition (Davis. 1), classified as charts and assessed at 20 per centum ad valorem, to be properly dutiable at only 7½ per centum ad valorem under paragraph 1410 of the Tariff Act of 1930, as modified by the British Trade Agreement, T. D. 49753, as bound books of *bona fide* foreign authorship, as alleged by the plaintiff.

To the extent indicated the specified claim in the three protests listed above is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.