(C. D. 1544)

Carson M. Simon & Co. *v.* United States

United States Customs Court, Second Division

(Decided July 28, 1953)

*Satterlee, Warfield & Stephens (Francis D. Kalosky* and *Richard M. FitzSimmons* of counsel) for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Alfred A. Taylor, Jr.,* special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: The merchandise the subject of this controversy consists of a two-volume work, entitled "Atlas of Human Anatomy." In its imported condition, it is in the form of unbound sheets, containing illustrations and some printed matter, which are folded in signatures of 16 pages. Illustrative plates of various aspects of the human body compose the great bulk of the volumes. Numbered consecutively, there are 512 such plates in volume I; 642 in volume II. For the most part, each of the plates covers a single page, although there are instances where two or three numbered plates appear together on the same page. The plates contain no text other than a title, both in English and in Latin, and the names, in Latin, following generally the Basle Nomina Anatomica, of the significant portions of the particular aspect of the body portrayed. In addition to the illustrations, each volume contains several title pages, a two-page preface subscribed by M. W. Woerdeman, the alleged author, a somewhat lengthy and detailed index, a page devoted to credits for the illustrations, and a page of errata.

The collector of customs at the port of Philadelphia classified this merchandise, which entered the country in two importations, totaling approximately 5,000 copies of each volume, as charts, and, in accordance with the provisions of paragraph 1410 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, assessed duty thereon at the rate of 12½ per centum ad valorem. It is the contention of the plaintiff that the imported sheets are books of *bona fide* foreign authorship, unbound but collated, and, hence, that they are dutiable at only 5 per centum ad valorem, pursuant to said paragraph 1410, as modified by said trade agreement.

Insofar as here applicable, paragraph 1410 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra,* provides as follows:

Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, sheets or printed pages of books bound wholly or in part in leather, pamphlets, music in books or sheets, and printed matter, all the foregoing not specially provided for:

If of bona fide foreign authorship:

    Prayer books, and sheets or printed pages of prayer books bound wholly or in part in leather_____ 4% ad val.

    Tourist literature containing historical, geographic, time-table, travel, hotel, or similar information, chiefly with respect to places or travel facilities outside the continental United States_____ 3¾% ad val.

    Other (except diaries)_____ 5% ad val.

\*     \*     \*     \*     \*     \*     \*

Drawings, engravings, photographs, etchings, maps, and charts:

    Containing additional text conveying historical, geographic, time-table, travel, hotel, or similar information, chiefly with respect to places or travel facilities outside the continental United States_____ 6¼% ad val.

    Other_____ 12½% ad val.

It appears from the testimony taken at the trial herein that, after importation, blank sheets are attached to each of the volumes for purposes of protection, and that the sheets are then sewn together and bound with kraft bindings and hard covers. No rearrangement of material nor additional printing is required.

It further appears that Dr. Woerdeman is a professor of anatomy at the University of Amsterdam, and at the Institute of Suydam, and a former professor of anatomy at Gioningen University. He is also a member of the Royal Academy of Science, dean of anatomists in Holland, and an outstanding man in the field of anatomy and histology. He is engaged both in research and in teaching.

The parties have stipulated that at all times pertinent hereto Dr. Woerdeman is and was a citizen of the Netherlands.

At this point, it is appropriate to note that plaintiff makes no contention that Dr. Woerdeman personally prepared the illustrations which, in the main, constitute the importation. The ideas for the sequence and order, and the selection of material were his; the prefaces, indexes, and other printed matter were written by him; but some of the dissections and all of the drawings thereof were supplied by others whose contributions to the finished volumes have been duly acknowledged in the work itself.

At the trial of this action, plaintiff called four witnesses in support of its contention that the involved merchandise consists of unbound books of *bona fide* foreign authorship. These were Willard T. Shoener, Dr. J. Vogeleer, William Brown McNett, and Dr. J. Parsons Schaeffer. No testimony was introduced in behalf of the Government.

Through the testimony of William Brown McNett, who for 32 years has specialized in illustrating medical and scientific textbooks, and of Dr. J. Parsons Schaeffer, a member of the medical profession, who taught anatomy for 27 years, has written several medical books, and is editor of Morris' "Anatomy," it has been established that Woerdeman's "Atlas of Human Anatomy" in two volumes, plain-

tiff's illustrative exhibits 3 and 4, is a systematic-arranged anatomy. By that description, according to McNett, is meant:

Anatomy arranged by the various systems in the body. The skeleton system of joints, system of muscles and so forth and in doing that the various systems are broken down into various parts of the body so that there is a continuous order.

Each phase of it is exhausted before the next one begins.   * * *

As explained by witness McNett, the significance of the sequence lies in the fact that Woerdeman has taken one complete body, not a composite, and each bone portrayed has reference to the other bones. On occasions, he has employed facing pages showing views which have to be examined together to get the full picture. It was evident to him from his experience in the field of medical art that these drawings were made from material which the artist could not invent, and that it would require particular skill and a great knowledge of anatomy to select the desired subject matter and insert these drawings, and to distinguish between the anomaly and the normal. The real key to the usefulness of the work is in the selectivity of the material.

Dr. Schaeffer testified that he likes his students to use this atlas "because it is beautifully illustrated," has "very splendid legends," and "because all those drawings are painstakingly made from one dissection representing that one body so that when the student uses that book in the laboratory without any further elaboration on the drawing he at once can compare it with his own dissection and see how his own dissection and the parts he is dissecting differs from that Atlas. * * *" He saw in the work the same orderly approach, by means of beautifully executed illustrations of actual dissections, which the physician takes in his initial examination of a sick person for the purposes of diagnosis. He stated further that the compiling of the index was "a terrible job," requiring a thorough knowledge of anatomy; that the producer of this work would have to be an expert in the field of anatomy; and that he considered Dr. Woerdeman an expert in that field.

Both men were of opinion that the effect and value of this atlas, its orderly sequence, would be decidedly impaired if the positions of any of the illustrations were changed. It would be tantamount to transposing a coherent text, and would result in disturbing its continuity.

Although plaintiff conceded that the illustrations, if imported separately, could properly be described as charts, it, nevertheless, contends that the atlas possesses the physical characteristics of an unbound book, and that by virtue of selectivity, arrangement, and sequence or collation, and the skilled application of intellectual prowess, the work is one susceptible of authorship within the meaning

of paragraph 1410, *supra*, citing *Baker, Lyman & Co., Inc.* v. *United States*, 24 Cust. Ct. 113, C. D. 1218; *United States* v. *American Railway Express Co. et al.*, 17 C. C. P. A. (Customs) 10, T. D. 43317; and *Oxford University Press, N. Y., Inc.* v. *United States*, 33 C. C. P. A. (Customs) 11, C. A. D. 309.

The Government urges, however, that proof of susceptibility of authorship of the instant merchandise has not been established. The competency of witness McNett to testify concerning plan, sequence, or continuity of the imported sheets is challenged on the theory that he is neither an author *per se*, nor a doctor or professor of anatomy, but a medical artist, and, hence, not qualified to express his opinion on any phase other than the style of the art work.

With respect to the witness Schaeffer, it is argued that his testimony regarding the use of this material, in connection with dissections and with the reading of X-rays, negatives the need for continuity or sequence, and consistently coincides with the collector's classification of these drawings as charts.

It is also contended by the Government that the 1,154 drawings in the imported merchandise constitute the more important part of the work, and the record lacks proof of the nationality of the persons who prepared these drawings.

We are of opinion that the position of the Government is not well founded, and that the cases cited by the plaintiff amply support the contention that the involved sheets are unbound books of *bona fide* foreign authorship. It is not amiss to note that no evidence was introduced by defendant at the trial of this case. The record stands upon the uncontroverted testimony of the two expert witnesses, McNett and Schaeffer, each eminently qualified in his particular field, who have established as facts that there was planned sequence and order in the work at bar and that it required considerable intellectual effort and a thorough knowledge of anatomy to produce it.

Printed sheets in the form of signatures, which require no further manipulation than binding and which contain "in orderly and connected fashion the record of the intellectual and literary work of the author" are books for tariff purposes. *W. H. Edwards* v. *United States*, 4 Treas. Dec. 638, T. D. 23177; *Wells, Fargo & Co.* v. *United States*, 16 Treas. Dec. 426, T. D. 29437; *American Express Co.* v. *United States*, 20 Treas. Dec. 643, Abstract 25256. If the matter contained on such sheets is something other than a mere mechanical production, and is of the kind which is susceptible of authorship, it falls within the tariff provision for unbound books. *United States* v. *Field & Co.*, 14 Ct. Cust. Appls. 376, T. D. 42031.

In the case of *National Tel. News Co. et al.* v. *Western Union Tel. Co.*, 119 Fed. 294, a suit involving the infringement of a copyrighted

news tape, under the copyright laws of the United States, the court had this to say concerning authorship:

* * * Generally speaking, authorship implies that there has been put into the production something meritorious from the author's own mind; that the product embodies the thought of the author, as well as the thought of others; and would not have found existence in the form presented, but for the distinctive individuality of mind from which it sprang. A mere annal, on the contrary, is the reduction to copy of an event that others, in a like situation, would have observed; and its statement in the substantial form that people generally would have adopted. A catalogue, or a table of statistics, or business publications generally, may thus belong to either one or the other of these classes. If, in their makeup, there is evinced some peculiar mental endowment—the grasp of mind, say in a table of statistics, that can gather in all that is needful, the discrimination that adjusts their proportions—there may be authorship within the meaning of the copyright grant as interpreted by the courts. * * *

As the word "authorship" in paragraph 1410, *supra*, and its predecessor paragraph 1310 of the Tariff Act of 1922 has met judicial construction, it has received almost as broad a connotation as that under the copyright laws and has not been confined to pure literary endeavors. Other expressions of intellectual skills and attainments have been held to fall within the meaning of the term.

In the case of *Oxford University Press, N. Y., Inc.* v. *United States, supra*, wherein was raised the question of who may properly be considered the author of an anthology of English verse, as distinct from the issue here which is one of susceptibility of authorship, the court found no congressional purpose in the enactment of said paragraph 1410 requiring a less broad interpretation of the term "author" than that which has been enunciated in cases relating to the copyright law. While not necessarily adopting that broad meaning, the court found authorship to exist where "much intellectual labor was expended and rare literary skill applied."

In *Kelly Publishing Co.* v. *United States*, 56 Treas. Dec. 108, T. D. 43493, cited with approval in the *Oxford University Press* case, *supra*, a directory containing advertisements and statistical information of individuals and concerns located throughout the world, which required mental effort and ability to prepare, was held to be susceptible of authorship.

*United States* v. *American Railway Express Co. et al., supra*, involved certain printed matter claimed to be of *bona fide* foreign authorship. The ultimate question there, as in the instant case, was whether such printed matter was susceptible of authorship, concerning which the court stated:

Accepting the definition as thus given of an author, as "one who composes or writes a book, a composer as distinguished from an editor, translator, or compiler," it is evident to the court that the exhibits before us are susceptible of authorship.

It would be a work of supererogation for us now to attempt to describe each exhibit individually, and to point out wherein authorship is manifest. It is sufficient to say that the exhibits are full of descriptive historical and geographical matter, and such matter as required mental effort and ability to prepare. It is said that some of these exhibits, notably illustrative Exhibit No. 6, Hotels and and Boarding Houses, is nothing but a compilation, and is not the work of an author. The testimony shows, as to this particular exhibit, that the person preparing it was obliged to investigate throughout the Canadian Provinces, and to obtain, in any way he could, information as to the various hotels and boarding houses and camps, and was required to arrange the same so that the information might be accessible. In addition, many tabulated statements of other matters of information to the traveler are contained in this pamphlet, which includes 80 pages of closely printed informative material. We are aware of no definition of authorship which would exclude a work such as this. To do so would exclude many valuable scientific publications, works on mathematics, digests, travelers' guides, and similar works, which, although to a considerable degree compilations, are, nevertheless, works which require authorship.

The *Baker Lyman* case, *supra*, relied heavily upon the foregoing quotation for the conclusion that a compilation of numerical tables, showing the Sun's True Bearing, or azimuth, in book form, used by ship navigators to correct their compasses and to locate their positions, was susceptible of authorship, and, being the work of an English national, was of *bona fide* foreign authorship.

There, the literary concept from which authorship was spelled out lay not in any writings as such, but in the overt expression, in numerical form, of the mathematical computations of the individual who had caused the book to be produced. As the result of a particular mental skill, an original work in the field of mathematics was created.

The same holds true in the instant case. The original ideas of a great anatomist were brought to fruition by artists who drew what he sought to have depicted, from material he had provided them. The illustrations were then arranged and collated by him in a sequence known to medical science as a systematic anatomy. Knowledge, experience, and much study entered into its creation. And, as surely as though the drawings were verbal descriptions of the human anatomy, they represent the thoughts, ideas, and intentions of its author.

We hold that the "Atlas of Human Anatomy," a two-volume work, is something more than charts. In its imported form, though unbound, it is a coordinated work, susceptible of authorship, and, in fact, authored by Dr. M. W. Woerdeman, a Dutch national. It, therefore, falls within the provision of paragraph 1410 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*, for unbound books of *bona fide* foreign authorship, which are dutiable at the rate of 5 per centum ad valorem. The claim in the protests to that effect is, therefore, sustained.

Judgment will be entered accordingly.